# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

MARION R.,[1]

      **Plaintiff,**

v.                            **Civil Action No. 2:21-cv-259**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Marion R. seeks judicial review of the Commissioner of Social Security's denial of her claim for supplemental security income ("SSI") under the Social Security Act. Specifically, Plaintiff contends the Commissioner's Administrative Law Judge ("ALJ") improperly weighed the opinion of a consultative examiner, which she argues is supported by a treating physician's checkbox opinion. As a result, she argues that the ALJ's residual functional capacity ("RFC") is not supported by substantial evidence. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. This Report finds no error in the ALJ's assessment of the evidence and therefore recommends that the court grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

# I.   PROCEDURAL BACKGROUND

Plaintiff initially filed for SSI benefits on February 18, 2016.  (R. 130).  Plaintiff alleged disability beginning November 1, 2013, based on human immunodeficiency virus ("HIV") and mental health issues.  (R. 93-94).  The state agency denied her application initially and on reconsideration.  (R. 130).  Plaintiff then requested an administrative hearing, which was held on April 11, 2018.  Id.  Counsel represented Plaintiff at the hearing, and a vocational expert ("VE") testified.  Id.  Plaintiff amended her alleged onset date to February 18, 2016, the date of her application.  (R. 66, 130, 318).  On June 12, 2018, ALJ Carol Matula ("ALJ Matula") denied Plaintiff's claim, finding that Plaintiff was not disabled during the period alleged.  (R. 138-39). The Appeals Council ("AC") issued an order on October 22, 2019, remanding the case to the ALJ. (R. 144-46).  The AC directed the ALJ that "[f]urther evaluation of the claimant's mental limitations [was] needed."  (R. 145).  Specifically, the AC instructed the ALJ to consider Plaintiff's moderate limitation in adapting or managing oneself.  Id.

Another hearing was held before ALJ Maryann Bright ("ALJ Bright") on February 28, 2020.  (R. 17, 32).  Again, counsel represented Plaintiff at the hearing, and a VE testified.  (R. 17). On March 12, 2020, ALJ Bright denied Plaintiff's claims for DIB, finding she was not disabled during the period alleged.  (R. 26).  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 20).  On July 29, 2020, the AC denied Plaintiff's request for review.  (R. 5).

On May 7, 2021, Plaintiff filed her complaint in this court.  Compl. (ECF No. 1).  Plaintiff seeks judicial review of the Commissioner's final decision that she was not entitled to an award of SSI, claiming that "[t]he conclusions and findings of fact of the Defendant are not supported by

substantial evidence and are contrary to law and regulation." Id. ¶ 8 (ECF No. 1, at 2).  On February 18, 2022, Plaintiff moved for summary judgment.  (ECF No. 21).  Plaintiff argues that this case should be reversed or remanded because the ALJ improperly weighed the opinion of her consultative examiner as supported by a treating physician's opinion.  Pl.'s Mem. L. Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 22, at 10).  On March 18, 2022, the Commissioner opposed Plaintiff's motion and moved for summary judgment.  (ECF No. 23).  The Commissioner argues that the ALJ's opinion was supported by substantial evidence because Plaintiff's symptoms improved with medical compliance and abstinence from substance abuse.  Mem. Supp. Def.'s Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 24, at 16).  Plaintiff replied. (ECF No. 25).  After a review of the record, this Report considers each of these arguments.

## II.     FACTUAL BACKGROUND

Plaintiff was born on November 5, 1969, and she was 46 years old on the date the application was originally filed, which is a younger individual under the Social Security Act.  (R. 25).  On the date of ALJ Bright's decision, which is before the court for review, she was 50 years old and thus a person closely approaching advanced age.  See (R. 26); 20 C.F.R. § 416.963(d). While Plaintiff worked after the application date, that work did not constitute substantial gainful activity ("SGA"), and so she has not engaged in SGA since the application date.  (R. 19).  She has a limited education, (R. 25), having completed the ninth or tenth grade of high school in the special education program, (R. 344, 609, 662), and failing to pass the General Education Development ("GED") tests after multiple attempts, (R. 662).   She has some experience performing housekeeping and cleaning work.  (R. 330, 344, 661).

3

A.     **Plaintiff's Mental Health Treatment**

Plaintiff's arguments in this court do not require a complete review of her medical history as she disputes only the ALJ's assessment of the medical history concerning her current mental health impairments.

1.     **Before Relevant Period (Prior to February 2016)**

Plaintiff has an ongoing history of depression that began when she was a teenager and worsened in 1993, around the time she was diagnosed with HIV. (R. 619). She has a history of attempted suicide, though not all attempts resulted in hospitalizations. (R. 608-09, 661). She also has a history of sexual trauma and physical abuse, (R. 610, 661-62, 672), and she was addicted to cocaine[2] for 20 years, (R. 608). During her incarceration at the Virginia Correctional Center for Women, from which she was released in August 2013, Plaintiff was prescribed medication for major depression. (R. 619); see also (R. 424-38).

In November 2013, Huma Hyder, M.D., Community Psychological Resources ("CPR"), saw Plaintiff for a psychiatric evaluation and medication management. (R. 619-20). Plaintiff reported feeling depressed, experiencing sleep difficulties, and becoming irritated easily. (R. 619). Plaintiff stated that she could not "keep a job because of anger issues and aggression in the past." Id. She reported last using cocaine in 2008, before her incarceration. Id. Dr. Hyder diagnosed her with bipolar disorder, prescribed medication, and recommended individual therapy and counseling. (R. 620). From December 2013 to September 2014, Plaintiff saw Dr. Hyder for medication management. (R. 614-18). In March 2014, Plaintiff relapsed on cocaine, (R. 617), but

---

[2] Although medical records mostly reference cocaine and crack cocaine, records indicate that Plaintiff previously abused marijuana, alcohol, pills, and heroin at different times since she was a teenager. See (R. 661-62).

otherwise appeared to be doing well, (R. 614-18).  Her mood and affect were noted as stable.  (R. 614-15).

### 2.      During Relevant Period (February 2016 – March 2020)

Plaintiff was incarcerated again from November 2014 to February 2016.  (R. 661); see also (R. 41, 626, 663).  Dr. Hyder did not treat Plaintiff while she was in prison.  (R. 663).

### a.      Establishing Treatment

In March 2016, Plaintiff's providers at Eastern Virginia Medical School ("EVMS")[3] recorded that she was "doing ok" on Wellbutrin.  (R. 626).  Her mood was euthymic.  (R. 627).

Later that month, Plaintiff returned to CPR for a new patient evaluation.  (R. 668).  She reported sleep problems and low energy.  (R. 670).  She was enrolled at the time in a 16-week culinary arts program.  (R. 671).  Her previous 20-year cocaine addiction was recorded, along with a note that she "ha[d] been clean for 6 months."  Id.  She drank socially.  Id.  A mental status exam showed that she was cooperative; made appropriate eye contact; was dressed neatly and appropriately for the weather; spoke quickly and spontaneously; had an average vocabulary and logical thought process; did not experience hallucinations or suicidal thoughts; and had a bright affect, adequate concentration, and good insight with fair judgment.  (R. 672).  She was advised to remain sober and actively participate in treatment.  (R. 673).

CPR progress notes record that in April 2016, Plaintiff was volunteering at Goodwill in addition to attending her culinary course.  (R. 678).  The next month, she was "tearful" because her partner continued to use drugs after undergoing rehabilitation treatment and was emotionally and verbally abusive of her.  (R. 677).  In May, Plaintiff's mood was euthymic.  (R. 678).  In June,

---

[3] Plaintiff saw EVMS for HIV management.  See, e.g., (R. 819, 836).

Plaintiff remained sober, but she did admit some non-hostile auditory hallucinations. (R. 674). That same month, Plaintiff reported to EVMS that she felt "less depressed." (R. 785).

In October 2016, Plaintiff reported to Dr. Hyder that she had run out of medication and was searching for employment. (R. 874). Her affect was stable, but her mood was anxious and nervous. Id. Dr. Hyder adjusted her medication doses. Id. In early November 2016, EVMS noted that Plaintiff's "[d]epression [was] controlled on multiple medications." (R. 788). The following week, Dr. Hyder noted that she was "[r]esponding fairly well to the medications," with an improved mood and stable affect. (R. 873). In mid-November, EVMS noted that she was alert and oriented and had an appropriate affect. (R. 861). The next month, Plaintiff reported to Dr. Hyder that she had a "low feeling lately." (R. 872).

In January 2017, Plaintiff told EVMS that she felt "less depressed." (R. 794). Dr. Hyder recorded that she had a better mood, she was stable, and her sleep was better. (R. 871). In February, EVMS noted that her depression was "well controlled on meds." (R. 799). She told EVMS she was "[d]oing ok" and "feeling quite well." Id. Throughout the spring of 2017, Plaintiff complained to EVMS about some fatigue potentially related to her mental health issues. See, e.g., (R. 803, 807, 811-12). In May 2017, Dr. Hyder noted that her mood was "good better," she was stable, her anxiety was improving with her medication, and she was sleeping well. (R. 870). In August 2017, EVMS noted she was doing well. (R. 819).

Plaintiff stopped taking her medication in late summer 2017 "because she felt like she was doing well." (R. 753). She reported that she had been out of prison for two years, was employed, was recently married, and "was feeling really positive . . . ." (R. 752).

### b.   Plaintiff Relapses

One of Plaintiff's daughters died in September 2017, (R. 747), from cardiac issues, (R. 933). In late November 2017, Plaintiff presented to the hospital emergency department "feeling intermittently suicidal" and "like things would be simpler if she end[ed] her life." (R. 747). She reported that, after her daughter's death, she started occasionally using ethanol alcohol and marijuana, which led her to relapse on crack cocaine, and she had been "using secretly at least once a week." (R. 747, 752-53). Her last use was the day before her admission. (R. 747). She said she "just got stressed," and came to the hospital when she felt like overdosing on prescription medication. (R. 752). Her mental examination showed that she had a neat and clean appearance; was alert, oriented, and cooperative; had good concentration, a congruent affect, and a calm mood; and demonstrated suicidal thought content and a preoccupied thought process. (R. 753-54). Plaintiff denied current suicidal ideation. (R. 752-53). She planned to contact her mental health providers and resume her medication. (R. 753). She did not constitute an active danger to herself or others, and she was advised to follow up with her providers for medication management and counseling. Id.

In February 2018, Plaintiff had a normal psychiatric exam with EVMS. (R. 829, 834). She denied suicidal ideation, (R. 837), and had a normal affect and unimpaired judgment, (R. 842).

### c.   Plaintiff Resumes Treatment

Plaintiff returned to CPR in early March 2018, saying she "need[ed] to get back on [her] meds." (R. 868). Louis Miller, Psy.D., evaluated her. (R. 940). Plaintiff's moods were unregulated, and she was experiencing anxiety and panic attacks. (868, 941). She had trouble functioning to work but was working a part-time job. Id. Plaintiff was crying, but denied suicidal

7

ideation, and she had good concentration and fair insight.  (R. 869, 942).  She was referred to Dr. Hyder.  Id.

Plaintiff denied depression to EVMS in late March 2018.  (R. 898, 906).  Later that same day, Plaintiff saw Dr. Hyder again.  (R. 932).  She reported that she was experiencing "[u]p and down feelings" and that her depression had worsened since her daughter's death.  (R. 933). Plaintiff said that "getting back on medications could help her to remain clean of substance abuse . . . and [that was] why she [was] returning for management."  Id.  A mental status exam showed a blunted affect and depressed mood, but good concentration and appropriate thought content.  (R. 932).  Dr. Hyder re-prescribed the same medication.  (R. 933).

In April, Plaintiff returned to Dr. Miller, reporting that she had "little motivation" and had been "anxious and sad."  (R. 935).  She had a depressed mood but was oriented and alert with an appropriate affect.  Id.  In June 2018, Plaintiff told Dr. Hyder that she was off her medications since March and had started hearing voices again.  (R. 936).  He re-prescribed the same medication and recommended continuing therapy.  (R. 937).  In August, Plaintiff was still not taking her medication, (R. 938), which Dr. Hyder continued prescribing, (R. 939).  Dr. Hyder noted that Plaintiff was "responding fairly well to the medications."  (R. 938).

In October 2018, Plaintiff had normal affect, unimpaired judgment, and was oriented, (R. 888), although she was depressed, without suicidal ideation, (R. 886).  She did, however, feel "less depressed."  Id.  In February 2019, Plaintiff denied depression and insomnia to EVMS, (R. 946), answering questions appropriately and displaying an alert and normal mental status, (R. 947).  In September 2019, her affect was normal, her judgment was unimpaired, and she was oriented.  (R. 884).

## B. Medical Opinions

### 1. State Agency Physicians and Psychologists

During Plaintiff's initial application review, Jameson Buston, M.D., reviewed the evidence and found that Plaintiff had no severe physical conditions that would limit her ability to work. (R. 100). On reconsideration, Tony Constant, M.D., largely agreed with Dr. Buston, finding that Plaintiff's "physical conditions" were "under control" and that she could engage in physical activity without impairment. (R. 117).

With regard to her mental impairments, on initial review, Eric Oritt, Ph.D., reviewed the evidence and found that Plaintiff had "some issues with maintaining concentration, but should be capable of performing simple, routine work." (R. 104). He also observed that Plaintiff "may have some difficulty with interacting appropriately with others and trusting others in the workplace." Id. On reconsideration, Alan D. Entin, Ph.D., recorded findings consistent with Dr. Oritt's findings. (R. 122).

### 2. Richard Shea, Ph.D.

In February 2014, before the relevant timeframe, Richard Shea, Ph.D., evaluated Plaintiff as part of a disability assessment. (R. 608). Dr. Shea recorded Plaintiff's history of depression and drug abuse. (R. 608-09). Her responses to his questions were goal-directed. (R. 609). She was alert and oriented with intelligence in the broad average range. (R. 610). She experienced auditory hallucinations, was angry at her mother and certain men, and would break things (usually her own). Id. She could spell "world" forward and backward, and her social judgment was limited. Id. Her energy level was low, and she had gained 40 pounds in the previous 5 to 6 months. Id. Dr. Shea assigned a prognosis of "guarded" and thought she needed financial management

9

assistance. (R. 611). He recorded that her "conditions need[ed] to be stabilized" and that "[s]he need[ed] to maintain abstinence." (R. 611).

### 2.    Dr. Hyder

On April 7, 2016, Dr. Hyder completed an evaluation for the Commonwealth of Virginia's Supplemental Nutrition Assistance Program's ("SNAP") employment and training program. (R. 623). The evaluation was two pages in length and utilized checkboxes. (R. 623-24). Dr. Hyder checked that Plaintiff was "[u]nable to participate in employment and training activities in any capacity at this time," handwriting that the duration was "unknown." (R. 623). He also checked a box recommending that Plaintiff apply for disability. Id. He checked that Plaintiff could participate for 10 hours a week in training activities. (R. 624). When asked for his professional opinion on limitations affecting Plaintiff's participation, Dr. Hyder marked "psychiatric limitations," and handwrote that "Pt. has a DX of SMI/Biopolar D/O and has been treated for it several years." Id. He listed her primary diagnosis as bipolar disorder. Id. He found Plaintiff currently compliant with treatment and did not recommend additional evaluation. Id.

### 4.    Christine Work, LPC, LMFT, RN

In May 2016, after a referral from the Disability Determination Services, Plaintiff underwent a mental status evaluation performed by Christine Work ("Ms. Work"). (R. 660-67). Ms. Work is a licensed professional counselor ("LPC"), licensed marriage and family therapist ("LMFT"), and registered nurse ("RN"). Id. Ms. Work reviewed records from Dr. Shea and Dr. Hyder regarding Plaintiff's history, diagnosis, and treatment. (R. 660). She recorded Plaintiff's bipolar disorder diagnosis and history of drug abuse. (R. 660-61). Plaintiff reported to Ms. Work the effect of her mental health conditions on her functioning:

> I don't like to be around a lot of people. I think everyone is talking about me. I have had so much traumatic stuff in my life it is not easy for me to get along with

10

> people.  I am forgetful and they say I don't follow directions good.  I never was able to keep a job.  Some days I don't feel like being around nobody.  It is easier for me not to go to work.  I get into these moods where I just say in my room and don't do nothing.  I am forgetful and slow in my work.  I was never really able to function in a job situation.

(R. 660).  Plaintiff reported that her longest job lasted only three months, and that she was either terminated for poor performance or a slow pace, or she left voluntarily because she became bored or her medication made her tired.  (R. 661).  Plaintiff reported that she had run out of medication the month prior, and that her last suicidal thought was at approximately the same time.  Id.  Plaintiff acknowledged that, while her "mental health issues are chronic, . . . they stabilized when she was on appropriate medication."  Id.  She was "eager to resume [medications] as they [did] help her to maintain stability."  (R. 664).

Plaintiff reported that she slept an average of four hours per night and had nightmares of being raped.  (R. 662).  She could "maintain her hygiene most of the time," but sometimes needed a reminder to shower.  (R. 663).  Her daily activities included reading, talking with her daughters on the phone, cleaning, and watching television.  Id.  She often lost interest after starting a book.  Id.  She could complete tasks in a timely manner.  Id.  She denied grocery shopping but did shop for personal items.  Id.  She could accurately calculate change from a five-dollar bill.  Id.  She had 12 grandchildren but reported that they "pluck[ed her] nerves," and she had "to be in a certain mood to be around them."  Id.

A mental status examination showed that she was alert and fully oriented.  (R. 664).  She could answer Ms. Work's questions in a logical and coherent fashion.  Id.  She did not have current delusions but reported "that when not on her medication, she thinks everyone is talking about her."  Id.  She was cooperative and showed intact judgment and insight.  Id.  She could perform basic addition and single-digit subtraction and multiplication.  Id.  She could recall 3/3 words

immediately and 2/3 words after five minutes.  Id.  She could not spell "world" forward and backward.  Id.

Ms. Work assigned Plaintiff a "poor prognosis for achieving and maintaining adequate social, emotional, and occupational functioning."  (R. 665).  She found that Plaintiff had not historically been able to maintain employment because of her drug use, her difficulty mastering tasks, and for being a slow worker.  Id.  Ms. Work determined that Plaintiff was "not currently able to" perform certain work-related tasks, including

> Perform detailed and complex tasks versus simple and repetitive tasks[;] Maintain regular attendance in the work place[;] Perform work activities on a consistent basis[;] Perform work activities without special or additional supervision[;] Complete a normal workday or workweek w/o interruption resulting from her psychiatric condition[;] Accept instructions from supervisors[;] Interact with coworkers and with the public[; and] Deal with the usual stresses encountered in competitive work[.]

Id.  Ms. Work noted that Plaintiff would be "competent to manage her own funds when she is stable and on her medication."  Id.

## C.   Testimony Before the ALJ

The ALJ[4] questioned Plaintiff at the hearing on February 28, 2020.  (R. 37-46).  The ALJ also heard testimony from the VE, Barbara Byers.  (R. 51-54).

### 1.   Plaintiff's Testimony

On direct questioning by ALJ Bright, Plaintiff testified that she lived with her aunt and uncle, who ensured that she attended medical appointments and had what she needed.  (R. 38). She worked for a cleaning service for at least a few days a week up to a whole week, depending on her moods, but only for a few hours a day.  (R. 39).  She represented she was fired twice for

---

[4] The court has not summarized Plaintiff's or the VE's hearing testimony from April 11, 2018, prior to remand from the AC.  (R. 63-91).

depression-related nonattendance. Id. She reported that she could not work because of her limited attention span and her moods. (R. 42).

Plaintiff recalled that she was hospitalized for about a week in 2017 after her daughter died. (R. 43). She testified that if she was compliant with her prescribed medication, she did not abuse illegal drugs. (R. 44). She testified that she last used drugs in 2017. Id. She testified that the medication helped "a little bit" with her psychotic episodes and bad dreams. (R. 51); but see id. (testifying earlier that medication was not "helping").

Her daily activities included attending work, which her uncle would drive her to and from, and watching television. (R. 44). She helped with some household chores, like cleaning her bedroom and the bathroom. Id. She did some cooking, such as microwave meals. (R. 45). She experienced manic moments and also moments when she isolated herself, sometimes for several days. (R. 47). She reported that in June 2018, she had an intentional overdose as a reaction to her daughter's death, but that she was "doing pretty good" at the time of the hearing. Id.

### 2.    Testimony from the VE

The ALJ's hypothetical for the VE posited a person with no past relevant work history, like Plaintiff, with the following limitations:

> [C]apable of medium exertion, limited to job tasks requiring only occasional decision making, and having only occasional changes in the work setting; the individual can tolerate occasional interaction with co-workers, supervisors and the public; the individual can tolerate a low-level of work pressure defined as work not requiring multi-tasking, significant independent judgment, sharing of job tasks or fast-paced tasks such as assembly line jobs involving production quotas; the individual is able to carry-out detailed but uninvolved instructions to perform simple routine and repetitive task on a regular and sustained basis to complete a normal workday and week.

(R. 52). The VE testified that jobs would be available to such a person. Id. The VE identified hand packager (DOT 920.587-018) with 40,000 jobs nationally; industrial cleaner (DOT 381.687-018), with 50,000 jobs nationally; and laundry laborer (DOT 361.687-018) with 10,000 jobs

nationally. (R. 53).  On further questioning from the ALJ, the VE testified that the identified jobs "have no interaction with the general public" generally.  Id.  The ALJ further restricted the hypothetical to an individual who was

> limited to frequent climbing of ramps and stairs, balancing, stooping, crouching, kneeling, and crawling; and occasional climbing of ladders, ropes, or scaffolds; occasional exposure to extreme cold, extreme heat, wetness, humidity, respiratory irritants such as fumes, odors, dusts, gasses, and poorly ventilated areas, and hazards of hazardous machinery and unprotected heights.

Id.  The VE testified the same jobs would be available under the modified hypothetical.  Id.  The VE further testified that no more than one absence a month and ten percent time off task would be tolerated.  (R. 54).

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996), superseded by statute 20 C.F.R. § 416.927(d)(2); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate,

the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.    ANALYSIS

Plaintiff's brief identifies one error in the ALJ's decision that she claims warrants remand. She contends that the ALJ's findings are not supported by substantial evidence because the ALJ improperly weighed Ms. Work's consultative opinion, which she argues is supported by Dr. Hyder's checkbox opinion for the SNAP program. As explained below, this Report finds no error in the ALJ's analysis. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

### A.    Framework for SSA Disability Evaluation

Title XVI of the Act provides SSI benefits to "financially needy individuals who are aged, blind, or disabled regardless of their insured status." Bowen v. Galbreath, 485 U.S. 74, 75 (1988) (citing 42 U.S.C. 1382(a)). As relevant here, the Act defines "disability" as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A)); accord 20 C.F.R. § 416.905(a). An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

15

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 416.920(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3. Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4. Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5. Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps. If the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. §§ 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ.

Hays, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.     The ALJ Decision Currently Before the Court for Review.**

At step one, ALJ Bright found Plaintiff had not engaged in SGA from her application date until the hearing date. (R. 19). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: other specified bipolar and related disorder, post-traumatic stress disorder ("PTSD"), simulant use disorder, and opioid use disorder. Id. At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 20). The ALJ developed a finding regarding Plaintiff's RFC. (R. 21-22). She determined Plaintiff could "perform a full range of work at all exertional levels," but assigned non-exertional limitations:

> She is limited to job tasks requiring only occasional decision making and having only occasional changes in the work setting. She is capable of only occasional interaction with coworkers, supervisors and the public. She can tolerate a low level of work pressure, defined as work not requiring multitasking, significant independent judgment, sharing of job tasks, or fast-paced tasks such as assembly line jobs involving production quotas. She can carry out detailed but uninvolved instructions to perform simple, routine, and repetitive tasks on a regular and sustained basis to complete a normal work day and week.

Id. At step four, the ALJ concluded that Plaintiff had no past relevant work. (R. 25). At step five, the ALJ relied on the VE's testimony to find that significant jobs existed in the national economy that Plaintiff could perform, ultimately finding that she was not disabled. (R. 25-26).

**C.     Substantial Evidence Supports the ALJ's RFC Finding Because She Appropriately Weighed the Opinions of Ms. Work and Dr. Hyder.**

Plaintiff has one only argument before the court. She argues that the ALJ failed to properly weigh the opinion of consultative examiner, Ms. Work, as supported by Dr. Hyder's opinion. Pl.'s Mem. (ECF No. 22, at 10). Ms. Work assessed a series of functional limitations that, if weighted, could impact Plaintiff's capacity to engage in any competitive work. See (R. 665); see also Pl.'s

Mem. (ECF No. 22, at 17) (citing SSR 85-15 for list of minimum abilities required for "competitive, remunerative, unskilled work"). After considering the ALJ's opinion and the record as a whole, I conclude that the ALJ's consideration of all opinion evidence conformed with the regulations.[5] The ALJ's finding is thus supported by substantial evidence.

In determining whether the claimant has a medically determinable severe impairment, or combination of impairments, that would significantly limit the claimant's ability to work, the ALJ must analyze the claimant's medical records and any medical evidence resulting from consultative examinations or medical expert evaluations. 20 C.F.R. § 416.927. When the record contains consistent medical opinions from different sources, the ALJ uses that evidence to determine disability. See § 416.927(c). If, however, the medical opinions are inconsistent with each other or with other evidence, the ALJ must evaluate the opinions and assign them persuasive weight. See § 416.927(c)(2)-(6). Medical opinions, including those from "medical sources who are not acceptable medical sources,"[6] are evaluated according to whether the source examined or treated

---

[5] Effective March 27, 2017, the SSA rescinded 20 C.F.R. §§ 404.1527 and 416.927 and implemented a new rule governing the consideration of medical opinions. See § 404.1520c(c) (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. §§ 404.1527 and 416.927, in effect when Plaintiff filed her claim in February 2016. Parsons v. Berryhill, No. 3:18cv1107, 2019 WL 2252023, at *10 n.3 (S.D. W. Va. May 2, 2019).

[6] Plaintiff emphasizes that ALJs must evaluate the opinions of non-acceptable medical sources. See Pl.'s Mem. (ECF No. 22, at 12). Ms. Work is not an acceptable medical source because LPCs, LMFTs, and RNs—Ms. Work's three professional designations—are not "acceptable medical source[s]" under the regulations, see 20 C.F.R. § 416.902(a); see also Nichols v. Saul, No. 1:20-CV-00063-MOC, 2020 WL 5111211, at *3 (W.D.N.C. Aug. 31, 2020) (licensed professional counselor); Rotunno v. Astrue, No. 5:11-CV-59, 2012 WL 2020147, at *1 (D. Vt. June 5, 2012) (licensed marriage and family therapist); King v. Colvin, No. C13-3039-LTS, 2014 WL 1344194, at *5 (N.D. Iowa Apr. 4, 2014) (registered nurse). The regulations specify that although the ALJ will "us[e] the same factors" to evaluate opinions from non-acceptable and acceptable medical sources, each factor's relevance "depends on the particular facts in each case." § 416.927(f)(1). The nature of Ms. Work's opinions renders the distinction between acceptable and non-acceptable medical sources immaterial for this dispute.

the plaintiff, consistency and supportability, any specialization, and other relevant factors.   § 416.927(f)(1) (referring to factors in § 416.927(c)(1)-(6)); see also SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

The ALJ assigned "less weight" to Ms. Work's opinion because Plaintiff had been off her medication for a month during the examination and subsequent treatment "indicate[d] improvement with medication." (R. 24).   Ms. Work's narrative opinion supports the ALJ's assessment of the record.  During her exam, Plaintiff told Ms. Work that "the supply of medication she had received upon her release from prison ran out one month" prior and that she did not have an appointment with her psychiatrist until the next month. (R. 661).  Plaintiff also stated she was "eager to resume [her medications] as they [did] help her to maintain stability." (R. 664).  If medication can reasonably control an impairment, the impairment is not a basis for disability. See § 20 C.F.R. 416.930.  A claimant will not be found disabled if a claimant does "not follow the prescribed treatment without a good reason . . . ."[7] § 416.930(b).  In addition to Plaintiff's lack of medication, the ALJ observed that Plaintiff had not received "ongoing mental health treatment prior to the examination[.]" (R. 24).  As Ms. Work noted, although Plaintiff had seen an outpatient therapist a few times since her release from prison, she had not been treated by Dr. Hyder while incarcerated and had yet to return.  (R. 663).  These are all appropriate factors for the ALJ to

---

[7] Plaintiff has not specifically alleged that her noncompliance is the result of her mental illness.  A court may consider whether mental illness causes the non-compliance.  See Pate-Fires v. Astrue, 564 F.3d 935, 946 (8th Cir. 2009).  However, Plaintiff's lapses appear mostly attributable to other forces, such as her incarcerations, (R. 661), or her unimpaired decision to cease them, (R. 753).  Furthermore, Plaintiff does not resist her aunt's reminders her to take her medication, although it is unclear from the record whether those reminders are even necessary.  (R. 76-77); see also (R. 38).  But see (R. 48-49) (testifying that she does not "want to take anything" when she is depressed at times).  Plaintiff has expressed her own desire to be on medication.  See (R. 868).  Therefore, Plaintiff has not established a good reason not to consider medication compliance.

consider in assigning weight to any opinion evidence of impairment.[8]   Therefore, substantial evidence supports the ALJ's consideration of Ms. Work's opinion in this case.

### 1.     The ALJ Did Not Cherry-Pick or Mischaracterize the Evidence.

Plaintiff argues that the ALJ cherry-picked the record by considering Plaintiff's non-medicated status, Pl.'s Mem. (ECF No. 22, at 13), to which Defendant responds that "the ALJ reasonably found that Ms. Work's opinion . . . was not representative of Plaintiff's functioning while on prescribed medication," Def.'s Opp'n (ECF No. 24, at 20).   Cherry-picking occurs when an ALJ focuses on "a single treatment note that purportedly undermines [the source's] overall assessment of [the plaintiff's] functional limitations . . . ." Hudson v. Colvin, No. 12-cv-269, 2013 WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011)).   However, several notes throughout the record as a whole show that Plaintiff improved with medication. See, e.g., (R. 676, 689, 788, 794, 870).   Ms. Work was a consultative examiner who provided only an "individual examination[]" at one point in Plaintiff's history, 20 C.F.R. § 416.927(c)(2), and at that point, Plaintiff was unmedicated, see (R. 663, 664).   It was not cherry-picking for the ALJ to consider this context. See § 416.930(a), (b).

---

[8] "[I]f alcoholism or drug addiction is a material contributing factor to the disability finding," then a disability finding can be precluded.   Delk v. Colvin, 675 F. App'x 281, 283 (4th Cir. 2017) (citation omitted).   If "an ALJ finds a plaintiff disabled and also finds evidence of substance abuse, [the ALJ] must determine whether the disability would exist in the absence of the substance abuse." Marvin J. v. Kijakazi, No. 2:20cv356, 2021 WL 3719274, *12 (E.D. Va. July 30, 2021) (citing Delk, F. App'x at 283), R. & R. adopted by 2021 WL 3711179 (Aug. 20, 2021).   Some of Plaintiff's more severe symptoms are apparently related to her previous substance abuse.   See, e.g., (R. 662) (recording that Plaintiff lost previous jobs because of substance abuse).   However, other than Plaintiff's relapse in November 2017 following her daughter's death, see (R. 747-53), Plaintiff has not apparently abused cocaine and other substances during the relevant timeframe.   Furthermore, although Plaintiff relapsed on cocaine, she attributed much of her symptoms to her cessation of medication.   See (R. 752) (stating that she "just got stressed and [she had not] been taking [her] medications and [she] was feeling suicidal").   Further, the ALJ found that Plaintiff was not disabled.   Thus, the ALJ was not required to distill Plaintiff's symptoms caused by the substance abuse.

Nor did the ALJ mischaracterize Ms. Work's opinion. See Arakas v. Comm'r, SSA, 983 F.3d 83, 99, 102 (4th Cir. 2020) (finding that the ALJ errs when misstating or mischaracterizing facts). Plaintiff argues that the ALJ incorrectly "suppose[d] that LPC Work was not absolutely aware [that Plaintiff was unmedicated] when she rendered her opinion and, as such, factored this information into her conclusions." Pl.'s Mem. (ECF No. 22, at 13). Plaintiff apparently argues that because Ms. Work was aware Plaintiff was not taking medication, assigned limitations apply regardless of medication. See id. But Ms. Work opined only on Plaintiff's limitations based on her point-in-time examination while Plaintiff was non-compliant with her medication. Specifically, Ms. Work listed limitations that Plaintiff was "not currently able to" accomplish— that is, when she had not taken her prescription medication for a month. (R. 664-65) (emphasis added). Elsewhere, Ms. Work acknowledged Plaintiff's increased capacity when on medication, finding her "competent to manage her own funds when she is stable and on her medications." (R. 665) (emphasis added). Ms. Work also recorded multiple comments that Plaintiff herself made about the stabilizing impact of medications. See, e.g., (R. 661) (reporting that if she went off her "medication, [she] would relapse"); (R. 664) (stating she was "eager" to restart medications because "they do help her to maintain stability"). As this context is why the ALJ gave the opinion less weight, see (R. 24), the ALJ apparently understood the record and did not mischaracterize the evidence.

**2.  The ALJ's Analysis of Plaintiff's Mental Illness Is Supported by Substantial Evidence.**

Plaintiff argues that the ALJ misunderstood "Plaintiff's history of illness" by finding that her impairments improved when compliant with medication. Pl.'s Mem. (ECF No. 22, at 13); see also Pl.'s Reply (ECF No. 25, at 2) (arguing the ALJ ignored "the very nature of mental illness"). She relies on Testamark v. Berryhill, in which the Fourth Circuit observed that "[s]ymptoms of

mental illness may wax and wane over the course of treatment . . . ." 736 F. App'x 395, 398 (4th Cir. 2018) (citing Garrison v. Colvin, 759 F.3d 995, 1017-18 (9th Cir. 2014) (considering "intermittent symptom remission")). "Cycles of improvement and debilitating symptoms are a common occurrence" in the treatment of mental illness, and the ALJ must interpret the records "with an understanding of the patient's overall well-being and the nature of her symptoms." Garrison, 759 F.3d at 1017 (citations omitted).   The ALJ's opinion accurately accounts for Plaintiff's mental illness.

In this case, the ALJ found, and the record amply supports, that Plaintiff's cycle of symptoms is caused by her cyclical compliance with medication, not the disease itself. The record shows that Plaintiff's non-compliance caused her symptoms to worsen. See, e.g., (R. 747-54, 868, 933, 936, 938, 941). However, when Plaintiff was compliant with mental health treatment and medication, her symptoms improved. See, e.g., (R. 785, 788, 799, 870, 871, 873, 946). Plaintiff testified at her administrative hearing that medication prevented her drug abuse, (R. 44), and identified this pattern herself to providers, see, e.g., (R. 868) (stating she "need[ed] to get back on [her] meds"). These are not waxing and waning symptoms that happen while compliant with a "course of treatment"—they are symptoms that return when Plaintiff ignores the course of treatment. Testamark, 736 F. App'x at 398; see (R. 747-54) (feeling intermittently suicidal when she stopped taking effective medication). After carefully analyzing the medical record, the ALJ understood this pattern. See (R. 23) (observing that Plaintiff "experienced improvement in mental health symptoms with medication and regular mental health treatment"). This is not a case in which the ALJ relied on a single isolated exam to discount other inconsistent findings. Cf. Wilson v. Colvin, No. 8:15-CV-04185, 2016 WL 6471904, at *14 (D.S.C. Oct. 19, 2016) (concerning

reliance on "a few treatment notes" regarding "a particular office visit"), adopted by 2016 WL 6433500 (Oct. 31, 2016).

Plaintiff also argues that Ms. Work had "access to Plaintiff's records as supplied by Dr. Shea and Dr. Hyder," which ensured that she was aware of Plaintiff's history. Pl.'s Mem. (ECF No. 22, at 13); see also Pl.'s Reply (ECF No. 25, at 3). However, Dr. Shea's opinion, rendered outside the relevant timeframe, also emphasized the importance of stabilizing Plaintiff's conditions and drug abstinence. See (R. 611) (currently reporting medication compliance). Dr. Hyder's treatment notes similarly stressed the importance for Plaintiff to remain compliant with medication and abstain from drug use. See (R. 620). These records thus support the correlation between Plaintiff's performance and her treatment. Testamark emphasized the need to understand "the record's broader import," which in this case is that Plaintiff performs better when compliant with her treatment regimen. Testamark, 736 F. App'x at 399.

### 3. Plaintiff's Ability to Sustain Prolonged Activity Under Her RFC Is Supported by Substantial Evidence.

Plaintiff also argues that the ALJ assumed Plaintiff could sustain prolonged activity simply because she performed well on medication. Pl.'s Mem. (ECF No. 24, at 22). In Singletary v. Bowen, the Fifth Circuit held that an SGA determination is more than an ability to "find employment and . . . physically perform certain jobs"—the plaintiff must be able to "hold whatever job he finds for a significant period of time." 798 F.2d 818, 822 (5th Cir. 1989); see also Rinaca v. Colvin, No. 1:15-CV-1242, 2016 WL 1223074, at *6 (E.D. Va. Mar. 28, 2016) (applying Singletary, 798 F.2d at 822). The ALJ found that Plaintiff could work "on a regular and sustained basis" under the RFC she fashioned. (R. 22). The ALJ also specifically accounted for Plaintiff's mental limitations, restricting Plaintiff to occasional decision-making, changes, and interactions

with others; low work pressure; and simple tasks. (R. 23-24). The ALJ's assessments thus show that she considered the nature of Plaintiff's impairments when fashioning the RFC.

Plaintiff maintains that the ALJ "failed to properly consider LPC Work's knowledge of Plaintiff's history." Pl.'s Mem. (ECF No. 22, at 16). Ms. Work summarized Plaintiff's historical difficulty with employment, including that Plaintiff claimed her longest job lasted less than three months, that employers fired her for poor performance or slow pace, and that she quit some jobs because she "became tired of them" or her HIV medications made her sick or tired. (R. 661). However, the ALJ used Ms. Work's observations to assign Plaintiff a moderate limitation in concentrating, persisting, or maintaining pace. (R. 21). The ALJ factored this into the RFC assessment by limiting Plaintiff to simple, non-production tasks, observing that Plaintiff's daily activities, such as cooking and working a part-time job, "support that [Plaintiff] is able to perform simple tasks." (R. 24). Nothing about Ms. Work's opinion undermines the ALJ's findings that, with the appropriate RFC limitations, Plaintiff would be capable of sustained employment.

Plaintiff cites Ms. Work's opinion for symptoms that would make sustaining work challenging. See Pl.'s Mem. (ECF No. 22, at 15-16) (citing R. 660-65). Ms. Work recorded Plaintiff's own statements about her symptoms. See (R. 660) (noting that Plaintiff "served as informant for this interview"). Plaintiff also cites her own hearing testimony for similar symptoms. Id. at 14 (citing R. 34-56, 65-92). In particular, Plaintiff relies on her part-time cleaning jobs, which have only required between two and three hours per day for a few days a week. Id. (citing R. 72); see also (R. 39). This evidence amounts to Plaintiff's own statements about her symptoms, which are evaluated under 20 C.F.R. § 416.929(a). But the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. 23). In addition

to Ms. Work's opinion, the ALJ summarized other medical evidence showing that throughout 2017 and 2018, while on medication, Plaintiff was stable, with good concentration, normal affect, and nonimpaired judgment. Id. Because Plaintiff responded to medication, the ALJ's assessment of Plaintiff's subjective statements is supported by substantial evidence.

The standard of review is also important. The court must defer to the ALJ's findings if supported by substantial evidence. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 868. This appeal is not an opportunity to relitigate the case. If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court must defer to the ALJ. Craig, 76 F.3d at 589. Because the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding.

### 4. Ms. Work's Opinion Is Not Entitled to Greater Weight for Being Consistent with the Checkbox Opinion of Plaintiff's Treating Physician, Dr. Hyder.

Plaintiff argues that "LPC Work's opinion is entirely consistent with Dr. Hyder's contention that Plaintiff was unable to participate in full time employment." Pl.'s Mem. (ECF No. 22, at 16) (citing R. 623). Opinions that are "consistent . . . with the record as a whole" can receive greater weight. 20 C.F.R. § 416.927(c)(4). The ALJ gave "no weight" to Dr. Hyder's check-box opinion because he did not identify any functional limitations and because Plaintiff's ability to work is an administrative issue. (R. 24). Defendant thus argues that the ALJ appropriately weighed Dr. Hyder's opinion. Def.'s Opp'n (ECF No. 24, at 23). I agree.

Under the regulations, "[m]edical opinions are statements . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."[9] 20 C.F.R.

---

[9] The new regulations define medical opinion even more narrowly. See 20 C.F.R. § 404.1513(a)(2). Because Dr. Hyder's medical records do not specify functional limitations, it would not even be considered

§ 404.1527(a)(1).  Ordinarily, a treating source's opinion will be given controlling weight if it is well-supported by medically acceptable diagnostic methodology and not inconsistent with other substantial evidence in the record.  § 416.927(c)(2); <u>Lewis</u>, 858 F.3d at 867.  But the ALJ need not accept opinions from a treating source in every situation.  For instance, if the treating source's opinion is inconsistent with other evidence or not otherwise well-supported, it is due no special deference.  § 416.927(c); <u>Craig</u>, 76 F.3d at 590.  If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]."  SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).  The ALJ must "give good reasons . . . for the weight" assigned to a "treating source's medical opinion."  § 416.927(c)(2).

The ALJ here gave good reasons for discounting Dr. Hyder's check-box opinion.  The ALJ noted that Dr. Hyder only cited Plaintiff's bipolar diagnosis but did not identify any functional limitations.  (R. 24).  The regulations provide that "[t]he better an explanation a source provides for a medical opinion, the more weight [the Commissioner] will give that medical opinion."  § 416.927(c)(3).  Dr. Hyder did not explain on the checkbox form how Plaintiff's bipolar disorder would cause Plaintiff to be so limited that she could not work.  (R. 623-24).  He only stated that Plaintiff suffered from bipolar disorder and would be disabled for an "unknown" length of time.  (R. 623).  As Plaintiff's bipolar disorder appears elsewhere in the record, and the ALJ considered her bipolar disorder a severe impairment, (R. 19), the diagnosis here did not impact the ALJ's analysis.

---

a medical opinion.  <u>See</u> (R. 623-24).  However, Plaintiff's claims are analyzed under the old rules.  <u>See</u> <u>supra</u> note 5.

Further, as Defendant argues, Dr. Hyder's opinion is a checkbox opinion. Def.'s Opp'n (ECF No. 24, at 23). The form required him to select whether Plaintiff could participate in all employment and training activities, some activities, or no activities,[10] without writing space to elaborate. (R. 623). Courts in this circuit commonly assign little weight to checkbox opinions, even from treating providers. Packett v. Berryhill, No. 3:17cv677, 2018 WL 6441529, at *13 (E.D. Va. Oct. 16, 2018) ("Courts in the Fourth Circuit have recognized the limited probative value of such checkbox opinion forms." (quoting Shelton v. Colvin, No. 7:13cv00470, 2015 WL 1276903, at *3 (W.D. Va. Mar. 20, 2015))), adopted by 2018 WL 6440875 (Dec. 7, 2018); Ferdinand v. Astrue, No. 4:12CV80, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) ("[S]uch forms are weak evidence at best and not entitled to great weight even when completed by a treating physician." (quoting Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)) (cleaned up)), adopted by 2013 WL 1333532 (Mar. 29, 2013). Therefore, the ALJ could reasonably determine that the checkbox opinion—standing alone—deserved no weight. But see Pate v. Berryhill, No. 5:16-CV-00864-D, 2018 WL 577998, at *8 (E.D.N.C. Jan. 10, 2018) (citing Garrison v. Colvin, 759 F.3d 995 (9th Cir. 2014)), adopted by 2018 WL 576833 (Jan. 26, 2018) (finding that treating physicians' checkbox opinions can receive greater weight when supported by records).

Dr. Hyder's treatment record is also not entitled to weight because he opined on an issue reserved to the Commissioner. Issues reserved to the Commissioner include "administrative findings that are dispositive of a case," including any "statement by a medical source that you are 'disabled' or 'unable to work[.]'" 20 C.F.R. § 416.927(d)-(d)(1). Dr. Hyder's opinion clearly falls

---

[10] In fact, Dr. Hyder selected that Plaintiff could not participate in any activities, although there was an option for "at least 10 hours per week," (R. 623), but then also marked that she could participate for up to 10 hours per week, (R. 624). Inconsistencies in the form design make Dr. Hyder's opinion here unfavorable.

within this prohibition because he simply opined that Plaintiff could not participate in employment activities, (R. 623)—an opinion that, if adopted, "would direct the determination or decision of disability," § 416.927(d).  Dr. Hyder also recommended that Plaintiff apply for supplemental security income and disability insurance benefits—again opining on a topic related to Plaintiff's administrative disability and not her medical capacity.  (R. 623).  That Plaintiff could not work was the crux of Dr. Hyder's opinion, and it is upon this irrelevant opinion that Plaintiff relies.[11] See Pl.'s Mem. (ECF No. 22, at 16).  Thus, the ALJ did not need to consider it, and Ms. Work's opinion does not enjoy greater weight because of consistency with this opinion.

### 5.    Plaintiff's Additional Arguments Are Without Merit.

Plaintiff also relies on the VE's opinion that more than one absence a month or ten percent time off-task would eliminate jobs. Pl.'s Mem. (ECF No. 22, at 17) (citing R. 54).  However, a VE's testimony is helpful only when "based upon a consideration of all other evidence in the record." Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (quoting Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)); see also Def.'s Opp'n (ECF No. 24, at 24).  Although Plaintiff has testified that she has difficulty with attendance, see, e.g., (R. 39), there is no record evidence that Plaintiff would have some measurable quantity of absences.  In fact, other than records containing Plaintiff's own reports that she found job attendance difficult, see, e.g., (R. 660, 661), Plaintiff has not identified any medical opinions that attendance problems would be caused by her mental impairments.  As the record evidence does not support the limitation, the ALJ was not bound by the VE's response this hypothetical point.

---

[11] Other of Dr. Hyder's records, generally recorded before Plaintiff's 2017 relapse, show that Plaintiff improved with medication, such as his September 2014 finding that she was stable on her medication, (R. 614), his November 2016 and August 2018 records that she was "[r]esponding fairly well to the medications," (R. 873, 938), and his May 2017 notation that she had "stable moods" and her anxiety was "improving with med[ication]," (R. 870).

## V.    **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 23), DENY Plaintiff's Motion for Summary Judgment (ECF No. 21), and AFFIRM the Commissioner's finding of no disability.

## VI.    **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 5, 2022